UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WISCONSIN

In re                                                                                           Chapter 13
Lenora Smith Davis,                                                              Case No. 12-27587-svk
          Debtor.

State of Wisconsin,
Department of Workforce Development,
          Plaintiff,
v.                                                                                                Adversary Case No. 13-2419

Lenora Smith Davis,
          Defendant.

## MEMORANDUM DECISION

Harambee Community School, Inc. ("Harambee") closed its doors without paying about $50,000 in unemployment contributions to the State of Wisconsin, Department of Workforce Development ("DWD"). DWD tried to collect the unpaid contributions from Harambee's administrator, Lenora Smith Davis (the "Debtor") under Wis. Stat. § 108.22(9). She filed a petition under Chapter 13 of the Bankruptcy Code, and DWD filed this adversary proceeding for a declaration that the Debtor's liability is not dischargeable in bankruptcy. The Debtor denies that she is liable under Wis. Stat. § 108.22(9).

DWD filed a Motion for Summary Judgment, and the Court determined that liability for nonpayment of unemployment contributions is a tax as defined in § 523 of the Bankruptcy Code, but left the remaining issues for trial. After the trial, three issues remained, and the parties filed post-trial briefs.

I. FACTS AND PROCEDURAL POSTURE

The Court has jurisdiction under 28 U.S.C. §§ 1334 and 157. As a nondischargeability determination, this is a core proceeding over which the Court has authority to enter a final order pursuant to 28 U.S.C. § 157(b)(2)(I).

The parties stipulated to the admission of a number of exhibits, and the Court heard the testimony of the Debtor, two officers of Harambee, and Kenneth Brady, the supervisor of DWD's unemployment

insurance tax collections unit. The evidence showed that Harambee was a non-profit corporation that operated a private elementary school in Milwaukee, Wisconsin. A Board of Directors (also called the School Board) ran the school. The Debtor was the "administrator" of Harambee, and when the principal unexpectedly left, she also filled that role. Beginning in 2009, the Board gave her the title "chief operating officer," although she was not an officer of the corporation. The president and vice president testified that they turned to the Debtor after a former administrator embezzled a large amount of funds. They provided the Debtor with the title "chief operating officer" in order to boost her credibility with the students, parents and staff at the school, but they did not give her authority over corporate management or financial decisions that such a title might imply.

The Debtor's actions with respect to finances were strictly supervised and controlled (essentially micromanaged) by the Board. The Board minutes confirm that all financial decisions were made by the Board, and then delegated to the Debtor. For example, the September 6, 2007 Finance Committee portion of the Board minutes noted: "Petty cash was used for some items such as office supplies and was not kept in a proper accounting system. For the future, Administration will not keep any petty cash." Board minutes frequently refer to advice given by Harambee's auditors and accountants, and the need for the Board to implement that advice.

Payroll and the payment of payroll taxes and unemployment contributions were handled by an outside service, Bene-Chex, Inc. and Harambee's accountants. The school's Accounting Policy and Procedures Manual states: "Payroll has been outsourced to a human resource payroll service provider who prepares the entire payroll for the school and makes the appropriate payroll tax deposits. The business office manager has full responsibility for coordinating all payroll and personnel activities with the human resource payroll service provider. The school uses the outside auditor to assist the business manager in preparing the necessary journal entries to book payroll cost." This policy was evidenced by a January 2009 letter from the accounting firm instructing the Debtor to sign an attached unemployment contribution tax form and mail it to DWD in an enclosed envelope. The letter also advised that the

2

accountants had arranged for the withdrawal of the unemployment tax deposit by electronic funds transfer and told the Debtor to deduct the payment from the checking account.

The Debtor testified credibly that she could not remember signing the unemployment contribution reports, and there was no evidence that she signed the reports for the periods when the contributions were not paid. The bulk of the reports were filed online by the accountants – the Debtor did not even know how to file the reports online – and the Debtor assumed the accountants arranged for payment by electronic funds transfer. The Debtor's supposition was confirmed by a May 31, 2010 invoice in which Harambee's accountant recorded a "Follow-up call to Curt Otto from Benechex regarding possible discontinuation of payroll services and advising him that Harambee is required to pay State Unemployment Compensation taxes."

The Debtor had the authority to sign checks, but all checks required two signatures. She admitted that her duties included "overseeing accounts payable and receivable," but these duties appeared to be limited to reporting the status of payables and receivables to the Finance Committee of the Board. Determinations as to when and how bills should be paid were made by the Finance Committee, and the Debtor was not a member of the Finance Committee. Her duties also included supervising staff, from maintenance staff to teachers, developing curriculum, administering school security, and managing the food service program. Although she was present at the school premises overseeing various departments, the Board of Directors and its committees supervised every aspect of the Debtor's management.

Around the time the unemployment contributions went unpaid, the Debtor's focus was squarely on securing accreditation for the school, which was necessary for its very survival. When Harambee's bank got wind that the accreditation decision was going to be adverse to the school, the bank seized the funds in Harambee's operating account, net of the payroll. The school was able to secure some funds through contributions and donations, but not enough to meet its obligations. Harambee's president testified that, along with other debts, there was no money available to pay to DWD for the unemployment compensation contributions. By December 2010, the utilities were cut off, and the school closed.

3

According to DWD, the first two quarterly unemployment contribution reports for 2010 were filed late. The contributions for those periods were never paid. DWD contends that Harambee owes the following amounts through October 2013, and that the Debtor is personally liable for the full amount:

| Quarter | Tax | Interest | Penalties | Costs | Total |
| --- | --- | --- | --- | --- | --- |
| 1Q 2010 | $26,836.37 | $10,497.67 | $50.00 | $78.78 | $37,462.82 |
| 2Q 2010 | $8,821.92 | $3,109.68 | $50.00 | | $11,981.60 |
| Total | $35,658.29 | $13,607.35 | $100.00 | $78.78 | **$49,444.42** |

II. ANALYSIS

Section 108.22(9) of the Wisconsin Statutes provides:

> An individual who is an officer, employee, member or manager holding at least 20% of the ownership interest of a corporation or of a limited liability company subject to this chapter, and who has control or supervision of or responsibility for filing any required contribution reports or making payment of contributions, and who willfully fails to file such reports or to make such payments to the department, or to ensure that such reports are filed or that such payments are made, may be found personally liable for such amounts, including interest, tardy payment or filing fees, costs and other fees, in the event that after proper proceedings for the collection of such amounts, as provided in this chapter, the corporation or limited liability company is unable to pay such amounts to the department. Ownership interest of a corporation or limited liability company includes ownership or control, directly or indirectly, by legally enforceable means or otherwise, by the individual, by the individual's spouse or child, by the individual's parent if the individual is under age 18, or by a combination of 2 or more of them, and such ownership interest of a parent corporation or limited liability company of which the corporation or limited liability company unable to pay such amounts is a wholly owned subsidiary. The personal liability of such officer, employee, member or manager as provided in this subsection survives dissolution, reorganization, bankruptcy, receivership, assignment for the benefit of creditors, judicially confirmed extension or composition, or any analogous situation of the corporation or limited liability company and shall be set forth in a determination or decision issued under s. 108.10.

At the trial, three issues were raised by the Court and disputed by the parties. First, did the Debtor hold at least 20% of the ownership interest of Harambee; second, assuming she did, did the Debtor have control or supervision of or responsibility for filing the required contribution

reports or making payment of contributions; and finally, did the Debtor willfully fail to file such reports or to make such payments to DWD.

The first issue is whether the Debtor held at least 20% of the ownership of the corporation. The Debtor did not own 20% of Harambee in the traditional sense; as a non-stock corporation, Harambee did not issue securities. But the definition of "ownership" in § 108.22(9) "includes ownership or control, directly or indirectly, by legally enforceable means or otherwise, by the individual . . . ." DWD argues that because the Debtor supervised school staff, filed reports with the Department of Public Instruction, and held other broad responsibilities with Harambee, she controlled the corporation. The Debtor denies that she controlled Harambee in the sense suggested by the statute.

The Court agrees with the Debtor. Although the term "control" is not defined in § 108.22(9), the context suggests that the term means control in the sense of corporate governance, not day-to-day management of corporate operations. Another Wisconsin statute expressly defines "control" as having the ability to direct voting shares or rights or to achieve a majority on the board of directors, not the ability to supervise day-to-day operations. Wis. Stat. § 214.01 provides:

> (3) (a) A person is considered to have control of a savings bank, savings bank subsidiary, affiliate or savings bank holding company if the person, acting alone or in concert with one or more persons, owns, holds, or directs with power to vote or holds proxies representing, 10% or more of the voting shares or rights of a savings bank, savings bank subsidiary, affiliate or savings bank holding company; or has the ability to achieve in any manner the election or appointment of a majority of the directors of a savings bank, savings bank subsidiary, affiliate or savings bank holding company.

The decisions of the Wisconsin Labor and Industry Review Commission ("LIRC") reinforce this interpretation. All of the LIRC decisions cited by DWD feature individuals who held themselves out as holding the requisite ownership interest or were designated as owners on

5

the corporate records.  None of the decisions involved an individual whose alleged control was limited to day-to-day operations under the strict supervision of a governing board.

For example, in *Mortgage Specialists, Inc.*, UI Hearing No. S9200409MW (LIRC Aug. 31, 1994), DWD issued an Initial Determination that Ardell Kreuser was personally liable for the corporation's unpaid taxes.  After an appeal, the LIRC set out the elements that DWD must prove to establish personal liability:

> (1) that Kreuser held at least 20 percent of the ownership interest of Mortgage Specialists; (2) that he had direct or supervisory responsibility for filing contribution reports or making contribution payments; and (3) that he willfully failed to make the payments or file the reports.

On the ownership element, the LIRC noted that Mr. Kreuser agreed to buy 49 percent of the corporation's stock (although he never paid for it), and he held these shares on the corporation's books.  Mr. Kreuser accepted stock dividends and voted his shares, all evidencing his ownership of the corporation.  In connection with his own claim for unemployment benefits, the decision observes:  "Significantly, during the investigation of his benefits claim, Mr. Kreuser stated he owned and controlled 49 percent of the Mortgage Specialists."  When the corporation experienced financial problems, the other 49% shareholder wanted to continue the operations, but Mr. Kreuser and the corporate secretary (who held the remaining shares) voted to liquidate.  Their decision prevailed, and Mr. Kreuser oversaw the liquidation of the corporation.  The facts in *Mortgage Specialists* are completely distinguishable from this case.  The Debtor never held herself out as owning any percentage of Harambee, did not control any decisions about Harambee's eventual liquidation, and never oversaw that liquidation.  Although she was a valued and important employee, the Debtor's control, if any, involved the day-to-day management of the school, not the governance of the corporation.

In 1997, after the LIRC decided *Mortgage Specialists, Inc.*, Wis. Stat. §108.22(9) was amended to add the "ownership includes ownership and control" language. However, later decisions do not retreat from focusing on traditional notions of ownership and control. For example, in *Leo J. Schilz*, UI Hearing No. S0100133MW (LIRC Dec. 10, 2001), the LIRC affirmed the Appeal Tribunal's decision that Mr. Schilz was personally liable for his corporations' unpaid taxes. The LIRC repeated the familiar elements of personal liability:

> First, the individual the department seeks to impose liability upon, must be an officer holding at least 20 percent of the ownership interest in the corporation. Second, the individual must have control or supervision of or responsibility for making unemployment insurance contributions. Third, the individual must willfully fail to make such payments or insure that such payments are made. Fourth, before imposing personal liability the department must first institute 'proper proceedings' against the corporation and the corporation must be unable to pay the taxes in question.

The LIRC rejected Mr. Schilz's claim that he was not an owner. Apparently, Mr. Schilz signed the contribution reports as an owner, and told a DWD representative that he had sold some corporate stock to another individual. The LIRC concluded: "All of this evidence, taken together, and particularly when coupled with the appellant's representations to vendors that he was an owner of the businesses in question, is sufficient to establish the ownership interest for purposes of the personal liability statute." In *Schilz*, the LIRC focused on Mr. Schilz's holding himself out as an owner of the corporation, rather than any functions and duties he carried out in operating the corporate business.

In *Michael A. Pharo*, UI Hearing No. S9900158MD (LIRC Dec. 28, 2001), the LIRC recognized that: "The statute specifically states that the ownership interest includes ownership or control, directly or indirectly, by legally enforceable means or otherwise." Based on the facts of that case, the LIRC concluded that Mr. Pharo was an owner:

> After the resignation in July of 1995 of Mr. Leach, the appellant operated the business. Pursuant to a July 18, 1995 shareholder resolution, the appellant was authorized from that point to act as president of the corporation. Upon Mr. Leach's resignation, the appellant changed the locks in the office and said he was taking over the corporation. This is sufficient to establish the requisite ownership or control for purposes of personal liability under Wis. Stat. § 108.22(9).

The facts in *Pharo* are closer to those in *Mortgage Specialists* than this case. In *Pharo* and *Mortgage Specialists*, the individuals held themselves out as corporate owners – and then "walked the talk" by taking over the corporations, changing locks and overseeing corporate liquidations. Here, the Debtor served as principal and administrator of a school under the strict control and supervision of a Board of Directors. While the Debtor admittedly had a long list of duties and responsibilities, she testified credibly that she was merely the "eyes and ears of the Board" at the school, and did not make financial or management decisions without Board approval. When Harambee's bank seized the funds in the corporate bank account, some donations trickled in to enable the Board to keep the school afloat until the announcement of the all-important accreditation decision. There was no evidence that the Debtor "took over" the liquidation either on her own (as in *Mortgage Specialists*) or with the vote of the stakeholders (as in *Pharo*). If locks were changed at Harambee, there is no evidence that the Debtor changed them.

The minutes of the Board meetings and the testimony of Harambee president Marreese Allen-Harris, and vice president Sister Calista Robinson, confirm that Harambee had a large, active Board of Directors and dedicated, involved officers who supervised and directed the Debtor's actions in school operations. For example, Ms. Allen-Harris testified that the Finance Committee made recommendations, and the Board ultimately decided which bills would be paid. (Transcript at 90). When asked whether paying bills or making decisions about what bills would

be paid was the Debtor's responsibility, Ms. Allen-Harris responded "No." (*Id*. at 88). Sister Robinson confirmed: "Well we certainly had a board and the board would give direction to Mrs. Davis on what to do." (*Id*. at 80). When asked, "So was there any task that Lenora completed as COO that she would have had unilateral power to go and do without any oversight from any entity including the school board?" Sister Robinson replied, "No." (*Id*.) Unlike in the LIRC decisions cited by DWD, the Debtor did not have control over corporate governance. While she may have had control over calling in a substitute teacher when needed, the Debtor lacked the kind of control over Harambee that is envisioned in Wis. Stat. § 108.22(9).

### III. CONCLUSION

Since a 20% ownership interest is a requirement for the imposition of personal liability, and since the Debtor did not own (or control as contemplated by the statute) 20% of Harambee, she is not personally liable for the unpaid unemployment contributions. As a result of this conclusion, it is not necessary to determine whether the Debtor had control over filing the reports or making the unemployment contribution payments. However, much of the testimony and evidence supported the Debtor's argument that she lacked such control.

The foregoing discussion constitutes the Court's findings of fact and conclusions of law. A separate Order will be entered dismissing the Complaint.

Dated: March 10, 2014

By the Court:

*Susan Kelley*
Susan V. Kelley
U.S. Bankruptcy Judge

9

Case 13-02419-svk    Doc 43    Filed 03/10/14    Page 9 of 9